IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT D. WATFORD,                    :
                                      :    CIVIL ACTION
          Plaintiff,                  :    NO. 19-5729
                                      :
     v.                               :
                                      :
PHILADELPHIA GAS WORKS,               :
                                      :
          Defendant.                  :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          October 12, 2021


          Presently before the Court is the motion for summary
judgment filed by Defendant, Philadelphia Gas Works ("PGW").
Plaintiff, Robert Watford, currently asserts claims against PGW
for: (1) race and age discrimination under a disparate treatment
theory pursuant to Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e, et seq. ("Title VII"), the Pennsylvania Human
Relations Act, 43 P.S. § 951 et seq. ("PHRA"), and the Age
Discrimination in Employment Act, 29 U.S.C. § 621 et seq.
("ADEA"); (2) retaliation under Title VII, the PHRA, the ADEA,
and the Pennsylvania's Workers' Compensation Act, 77 Pa. Stat.
Ann. § 1 et seq. ("PWCA"); (3) racially discriminatory hostile
work environment under Title VII and the PHRA; and (4) failure
to accommodate disability under the Americans with Disabilities

Act, 42 U.S.C. § 12101 et seq. ("ADA"), and the PHRA.[1] For the reasons that follow, the Court will grant PGW's motion.

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[2]

   A.   **Watford's Work History and Acceptance of the Senior Driver II Position**

   Watford is fifty-four years old and is African American. PGW hired Watford in 2002 to work in its distribution department and later in its supply chain department as a stock handler. On January 12, 2019, Watford took the position of Senior Driver II, becoming responsible for transporting equipment and materials to job sites around Philadelphia. Watford's supervisor remained Robert Widhson, the general supervisor for the supply chain department. Widhson was under forty years old at the time and is Caucasian.

   When the Senior Driver II position that Watford ultimately accepted became available, the vacancy announcement contained an error. The announcement stated that the top weekly pay rate for the position was $1,241. However, the top pay rate for the Senior Driver II position is controlled by the collective bargaining agreement ("CBA") between PGW and the

---

[1]   Plaintiff has withdrawn Count III of his amended complaint, race discrimination (disparate impact) under Title VII and the PHRA.

[2]   The Court views the facts in the light most favorable to Plaintiff, the non-moving party in this case.

2

union to which Watford belongs, and is set at $1,202 per week. Based on his years of service with PGW, Watford was eligible for the top pay rate of $1,202.

On January 4, 2019, Watford participated in an interview for the Senior Driver II position. Also in attendance were: (1) Widhson; (2) Edith Aponte, the manager of the supply chain department (and Widhson's supervisor); and (3) Natasha Moore, a member of PGW's human resources department. Widhson claims that he told Watford about the pay rate error during the interview, but Watford denies this. The proper pay rate is listed in Moore's interview notes and Aponte also remembered Widhson showing Watford the proper pay scale. Watford accepted the position on January 7, 2019, even though he was told it would be at the lower pay rate.

On January 8, 2019, Watford initiated a meeting with Aponte and Frank Adams, the director of the supply chain department, to again ask for the higher pay rate. Aponte and Adams explained to Watford that the CBA rate was controlling. Later that day, Widhson sought out Watford to ask why he continued to challenge the pay rate. The two men argued, called each other liars in relation to whether the pay rate error was discussed at the January 4, 2019 interview, and Watford exclaimed "young man, you need to watch how you talk to me. I am a grown man." Resp. Ex. I (ECF No. 25-11).

3

On January 9, 2019, Watson filed a complaint with the human resources department asserting that he should be paid the higher rate and that he felt threatened by Widhson during their argument. Ultimately, and after an investigation, Matthew Rohrer, the human resources department partner, concluded that Widhson's complaints lacked merit.

Within a few weeks of Watford starting as a driver, Idriss Byrd, a forty-three year old African American male, and Mike Lyon, a forty-seven year old Caucasian male, were also hired for Senior Driver II positions. Both men received the CBA pay rate.

Watford asserts that on multiple occasions, Widhson required Watford to stay back at the Tioga station, their base of operations, while allowing Byrd and Lyon to ride along with other drivers to gain experience. Watford testified, however, that he did not believe Byrd and Lyon were receiving preferential treatment based on their age or race. Rohrer explained in a February 7, 2019 email to Aponte and Adams that there were less opportunities for Watford and Lyon to ride along with other drivers at that point because they did not have their Class B commercial drivers licenses (which Byrd had) and that a contract dispute with the training school was preventing Lyon and Watford from obtaining their Class B licenses. He

4

recommended that the supervisors document who was receiving what assignments so that they could be distributed as equally as possible.

**B.    The Hazmat Endorsement Test**

A hazmat endorsement is required for the Senior Driver II position. Widhson testified that he told Watford when he accepted the position at the beginning of January 2019 that drivers typically obtain their hazmat endorsement within six months.[3] Watford testified that Widhson told him he had a year to take the test. By the end of July 2019, both Byrd and Lyon had passed the hazmat endorsement test. At that time, Watford had not yet scheduled his test.

During a union/management meeting on July 30, 2019, PGW management, including Widhson, told Watford that he needed to schedule a time to take the hazmat test.

On August 2, 2019, Watford filed a charge of discrimination with the with the Equal Employment Opportunity Commission ("EEOC") based on what Watford perceived as Widhson's ongoing harassment. The charge was amended on August 21, 2019.

---

[3]       In connection with the lawsuit, Widhson stated in an affidavit that drivers were required to test for the hazmat endorsement within four months, and Aponte stated that Widhson told this to Watford during the January 4, 2019 interview. Widhson also produced an interview sheet that he claims he uses during interviews which includes the four-month hazmat endorsement deadline.

On August 8, 2019, Widhson initiated a "union contact" for which Watford met with his union representative and Widhson regarding scheduling the hazmat test. During the meeting, Watford contended that he had a year to obtain the endorsement. Widhson threatened to charge Watford with insubordination, and Widhson and Watford again accused each other of lying. Watford offered to take the test in early September 2019, which Widhson found unacceptable. During the meeting, Watford referred to Widhson as "young man" multiple times and at least once after Widhson asked Watford to stop because he found it disrespectful. Watford also told Widhson that he had children older than Widhson.[4] There was a follow-up union contact with Watford on August 12, 2019 regarding taking the test.

### C.   Sick Leave

On August 22, 2019, Watford reported work-related emotional injuries he allegedly suffered due to Widhson's aggressive and intimidating behavior. Watford's physician requested that PGW excuse Watford from work until August 30,

---

[4]     On August 9, 2019, Widhson filed an internal age discrimination complaint against Watford based on Watford's unwillingness to stop calling Widhson "young man." Given Watford's admissions that he continued to call Widhson "young man" after Widhson asked him to stop, Rohrer, the human resources department partner, concluded that Watford had violated PGW's anti-harassment policy and recommended appropriate discipline. The Court is unaware of any discipline that actually occurred as a result of this conclusion.

2019 due to the emotional injuries. Utilizing his sick days, Watford remained out of work from August 22, 2019 through November 28, 2019. Watford filed a worker's compensation claim on September 9, 2019, but it was denied on September 10, 2019 after PGW concluded that he had not suffered a work-related injury.

Pursuant to the CBA, PGW may check whether a union employee is home sick when they do not report in due to an alleged illness. At management's request, Widhson performed two sick checks at Watford's home during the period of time he was out, which entailed Widhson (and, on at least one of the occasions, another supervisor) leaving notes at Watford's house asking him to call and let PGW know his status. Widhson had not performed sick checks on any other employees at any other time.

Watford returned to PGW on November 28, 2019, by which time he had passed the hazmat endorsement test. However, due to the length of his absence, Watford was not eligible to receive a progression raise upon his one-year anniversary in the Senior Driver II position since, pursuant to the CBA, union employees are not eligible for the raise if they have more than nine sick days during a given year.

D.   **Parking Spaces for Disabled Persons**

Watford had surgeries on his knees on November 3, 2017 and January 17, 2018 in connection with a work-related injury

that occurred on August 15, 2017. On August 14, 2018, Watford's physician provided a note to PGW clearing Watford for full-duty work. Watford returned to full-duty work on August 20, 2018.

On May 21, 2019, after Watford had transferred to the Senior Driver II position, Watford asked supervisor Dennis Stone if there were any parking spaces at the Tioga station for disabled persons ("accessible spaces") that he could use because of his knee issues.[5] At that time, there were no designated accessible spaces. Stone emailed Aponte, the manager of the supply chain department, about the request and PGW management discussed the request and the existence of spaces through e-mails until June 5, 2019. There is no record of additional discussions after that date and no accessible spaces were created at that time.

On June 18, 2020, more than a year after he first enquired about accessible spaces, Watford provided Rohrer with a copy of his state issued parking placard for disabled persons which he testified he received sometime prior to becoming a Senior Driver II. On August 5, 2020, Rohrer informed Watford by letter that PGW had created accessible spaces at the Tioga station.

---

[5]     Watford also testified, however, that his knees did not hurt walking from his vehicle to the Tioga station and that his knees did not limit his ability to perform his duties as a Senior Driver II.

### E.   Watford's Suspension

On March 4, 2020, Lyon, a fellow Senior Driver II, filed an internal complaint against Watford which led to Watford's temporary suspension with pay. Lyon contended that Watford called him a f*ggot after Watford did not park his truck in the proper spot and Lyon yelled at him because of the mis-location. Watford testified that he did not use the slur and that, instead, Lyon called him a f*cking n*gger. However, there is no evidence that Watford filed a complaint about the slur allegedly directed at him by Lyon or that he told anyone else about it at that time.

PGW hired an outside investigator to investigate Lyon's complaint against Watford. Watford was suspended for thirty days pending the investigatory outcome. Ultimately, Rohrer sent an email to Watford on April 6, 2020 reinstating him and concluding that "the investigation did not find direct evidence that would support that a violation of PGW policy occurred." Amend. Compl. Ex. C (ECF No 20-3). Watford was paid for the time he was suspended but he asserts that he was paid fifty cents less per hour than if he had actually worked and that he missed out on overtime opportunities.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
"A motion for summary judgment will not be defeated by 'the mere
existence' of some disputed facts, but will be denied when there
is a genuine issue of material fact." Am. Eagle Outfitters v.
Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A
fact is material if proof of its existence "might affect the
outcome of the suit," and a dispute is genuine if "the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Anderson, 477 U.S. at 248.

The Court views the facts "in the light most favorable
to the nonmoving party." Am. Eagle Outfitters, 584 F.3d at 581.
"After making all reasonable inferences in the nonmoving party's
favor, there is a genuine issue of material fact if a reasonable
jury could find for the nonmoving party." Pignataro v. Port
Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While
the moving party bears the initial burden of showing the absence
of a genuine issue of material fact, meeting this obligation
shifts the burden to the nonmoving party who "must set forth
specific facts showing that there is a genuine issue for trial."
Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)
(1963)).

## III. DISCUSSION

### A.   Race and Age Discrimination (Count I)

Watford contends that PGW discriminated against him by subjecting him to treatment disparate to non-African American younger employees in violation of Title VII, the PHRA, and the ADEA. All three claims are considered under the same analysis. Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 192-93 (3d Cir. 2015).

The Court concludes that Watford's claims rely on indirect evidence and, therefore, their analyses follow the McDonnell Douglas burden-shifting framework under which: (1) a plaintiff must first show a prima facie case; (2) the defendant must then "articulate some legitimate, nondiscriminatory reason for the employee's rejection"; and (3) then the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

A prima facie case of discrimination requires a plaintiff to establish that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful

11

discrimination. Id. at 410–411. The adverse employment action

must be "serious and tangible enough to alter an employee's

compensation, terms, conditions, or privileges of employment."

Komis v. Sec'y of United States Dep't of Lab., 918 F.3d 289, 292

(3d Cir. 2019) (quoting Jones v. Se. Pa. Transp. Auth., 796 F.3d

323, 326 (3d Cir. 2015)).

        In his response, Watford asserts that his disparate

treatment claims are based on the following events:

"(a) PGW via Widhson required, on a number of occasions, Watford
to 'stay back at the Tioga station' sitting for hours without
providing him with training or allowing him to [sic] out on the
streets for delivers [sic], while allowing Michael Lyon
(Caucasian) to do so," Resp. at 18 (ECF No. 25-1);

"(b) PGW via Widhson subjected Plaintiff to numerous union
contacts for his alleged failure to schedule his Hazmat
endorsement test even though PGW provided inconsistent
'deadlines' for obtaining the endorsement," id. at 18-19;

"(c) PGW found Plaintiff in violation of its Harassment policies
based on Widhson's an [sic] internal age harassment, which
subjected Watford to a disciplinary action," id. at 19; and

"(d) PGW via Widhson suspended Plaintiff without pay due to an
incident between Plaintiff and Lyon, where Lyon initiated and
instigated the incident by calling Plaintiff a 'f[*]cking
N[*]gger,' but allowed Lyon to continue to work." Id.

The Court initially concludes that Watford has failed to

properly assert that the first three events are adverse actions

that altered his "compensation, terms, conditions, or privileges

of employment." Komis, 918 F.3d at 292.

        First, there are no allegations that not being able to

ride along with other drivers as much as Watford would have

liked before he received his Class B license affected any of his compensation or privileges.[6]

Second, there is no evidence that having to endure multiple union contacts because Watford had not scheduled his hazmat test affected his compensation or privileges.[7]

Third, while Watson claims generally that he was disciplined for admitting to making ageist remarks to Widhson, he has failed to point to supportive evidence or even describe the nature of the alleged discipline. Thus, he has not shown that this incident affected his compensation or privileges.[8]

Regarding the final incident, his thirty-day suspension with pay, Watford does allege that he missed opportunities for overtime and would have been paid an extra

---

[6]     The Court also notes that Watford specifically disavowed in his deposition that he believed this alleged treatment was based on race or age. Mot. Ex. 1 at 98 (ECF No. 23-4).

[7]     Additionally, Watford points to no facts that he was treated differently than others in relation to taking the hazmat test or other circumstances that would lead to an inference that his race or age played a role in being subjected to union contacts.

[8]     Watford has also failed to point to any circumstance that would give rise to an inference of discrimination such as that others were treated differently than him regarding discrimination complaints filed against them. And, even if Watford could establish a prima facie case based on the alleged discipline, he would likely not be able to rebut PGW's stated reason (i.e., that he admitted to making ageist remarks to Widhson even after Widhson asked him to stop).

fifty cents per hour had he been able to work. However, the circumstances that Watford claims give rise to an inference of discrimination, that he was disciplined for allegedly uttering a slur while Lyon was not, is specious since there is no evidence that he filed a complaint against Lyon or that he told the investigator about the alleged slur. Thus, Watford has failed to present evidence that he was actually treated differently than others or to present circumstances that would give rise to a discriminatory inference.

As a result, summary judgment on Count I, alleging discrimination based on disparate treatment, is warranted.

**B.   Retaliation (Count II)**

Watford brings retaliation claims under Title VII, the PHRA, the ADEA, and the PWCA. All of these claims utilize the same McDonnell Douglas burden shifting analysis, given the lack of direct evidence.[9] Daniels, 776 F.3d at 192-93 (regarding Title

---

[9]      While the amended complaint styles this count as "Race and Age Discrimination – Retaliation," in the summary judgment response, Watford titles it "Retaliatory Hostile Work Environment and Antidiscrimination Retaliation." However, both parties analyze this count only under the general retaliation standard, and not under the hostile work environment standard discussed below in subsection III. C. Nonetheless, the discussion in subsection III. C. is equally applicable to a retaliatory hostile work claim. See Komis, 918 F.3d at 293 (providing that the same analysis is used for both discriminatory and retaliatory hostile work environment claims).

VII, the PHRA, and the ADEA); Spring v. Sealed Air Corp., 483 Fed. App'x 765, 768 (3d Cir. 2012) (regarding the PWCA).

The general McDonnell Douglas burden shifting framework has been described above. To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). Unlike a status-based discrimination claim, a plaintiff alleging retaliation need not show that the adverse employment action altered their compensation, terms, conditions, or privileges of employment, and need only show "that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 341 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Once a prima facie case and the defendant's legitimate reasons are established, a plaintiff must show that the stated reasons are pretextual, and unlike in a status-based discrimination claim, must ultimately prove "that the desire to

retaliate was the but-for cause of the challenged employment action." <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 352 (2013).

Watford specifically alleges that PGW retaliated against him for filing age and race-based discrimination complaints on January 9, 2019 and August 2, 2019 (as amended on August 21, 2019) and for filing a worker's compensation claim on September 9, 2019 because it:

"(a) initiated multiple union contacts against Watford within months of his transfer into the position of SCD Senior Driver II," Resp. at 22 (ECF No. 25-1);

"(b) initiated an internal complaint against Watford for age harassment of Widhson on August 9, 2019 based on trumped up allegations that amount to nothing more than 'petty slights and minor annoyances,' and found Plaintiff violated PGW harassment policy," <u>id.</u> at 22-23 (footnote and citation omitted);

"(c) sent Widhson to Plaintiff's home twice for 'sick-checks' while he was out sick due to stress, anxiety and depression based on Widhson's behavior, after two requests not to from Plaintiff's counsel due to the nature of his sick leave and where Widhson had never before nor since performed any sick checks," <u>id.</u> at 23; and

(d) "through its Worker Compensation provided [sic] denied Plaintiff benefits because he filed for [sic] due to his participation in dual filing of a discrimination charge with the EEOC . . . . As a result, Plaintiff had to take 52 days of sick leave and did not get a progression raise." <u>Id.</u> at 24.

PGW argues that Watford cannot show causation because of a lack of temporal proximity between his protected actions and the alleged acts of retaliation. However, in connection with this claim, PGW discusses only the denial of Watford's one-year anniversary raise and his suspension, neither of which are

16

incidents that Watford contends in his response were the basis for retaliation. Regardless, even assuming Watford has made a prima facie case, he cannot show that the reasons given by PGW are pretextual and that retaliation was the but-for cause of the actions at issue.

First, Widhson's initiation of the union contacts is related to Watford not complying with the requirement that he take and pass the hazmat endorsement test. The hazmat endorsement is a requirement of Watford's position. There is no evidence that Widhson's attempts to coerce Watford to take the test were related to retaliation rather than compliance with the requirement. Thus, no reasonable jury could find that Watford's complaints were the but-for cause of the union contacts that were initiated because of Watford's hesitation in complying with a requirement of his position.

Second, regarding Widhson's discrimination complaint against Watford, Watford admitted that he called Widhson "young man" and told him he had children older than Widhson, even after Widhson asked him to stop and explained that he found it disrespectful. That Widhson filed an internal complaint for age discrimination was well within his rights. There is no evidence that Watford's complaints were the but-for cause of Widhson filing the discrimination complaint against Watford. The only

evidence indicates that Widhson filed the complaint to address behavior he saw as disrespectful.

Third, regarding the two sick checks, it is undisputed that sick checks are authorized under the CBA. Moreover, Watford testified that he did not communicate with anyone in August or September 2019 regarding when he thought he might be able to return to work. Additionally, Widhson testified that he did not know why Watson was out sick. Under these circumstances, no reasonable jury could conclude Watford's complaints were the but-for cause of the two sick checks rather than an employer's concern for the reasons an employee was out sick for an extended period of time (and which was longer than recommended by his doctor).

Fourth, Watford seems to argue in one confusing sentence that his worker's compensation claim for emotional injuries was denied because of his EEOC discrimination charge filed over a month prior. This is a purely speculative and conclusory allegation. Watford provides no evidence to support this claim and certainly has not shown that the discrimination charge was the but-for cause of PGW's denial of his worker's compensation claim.[10]

---

[10]      Given that Watford does not appear to claim that PGW retaliated against him for filing the worker's compensation claim, the Court is also not convinced that this is a proper PWCA claim rather than a Title VII claim. See, e.g., Dunsmuir v. May Dep't Stores Co., 120 F. App'x 927, 929 (3d Cir. 2005)

In that there is no persuasive evidence linking the
events alleged by Watford as retaliatory to his protected
activities and he has failed to establish that his complaints
were the but-for cause of any of the enumerated events (which
have legitimate independent reasons for their occurrence),
summary judgment is appropriate on Watford's retaliation claims.

### C.   Racially Hostile Work Environment (Count IV)

Watford contends that he was subject to a racially
hostile work environment in violation of Title VII and the PHRA.
To establish a prima facie claim of hostile work environment,

> a plaintiff must show (1) that he suffered intentional
> discrimination because of race; (2) that the
> discrimination was severe or pervasive; (3) that the
> discrimination detrimentally affected him; (4) that the
> discrimination would have detrimentally affected a
> reasonable person of the same race in his position; and
> (5) that there is a basis for vicarious liability.

Brooks v. CBS Radio, Inc., 342 F. App'x 771, 775 (3d Cir. 2009)
(citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)
(overruled in part on other grounds by Burlington, 548 U.S.
53)). "Properly conducted, this analysis 'must concentrate not
on individual incidents, but on the overall scenario.'" Id.
(quoting Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001)).

―――――――――――――

("[T]he Pennsylvania Supreme Court held that a 'cause of action
exists under Pennsylvania law for wrongful discharge of an
employee who files a claim for workers' compensation benefits.'"
(quoting Shick v. Shirey, 716 A.2d 1231, 1238 (Pa. 1998)).

The first step of this test recognizes that "[m]any may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief," and, thus, the court must "identify what harassment, if any, a reasonable jury could link to a retaliatory [or discriminatory] animus." <u>Jensen</u>, 435 F.3d at 449-50.

In his response, Watford specifically contends that PGW created a racially hostile work environment:

(a) "by keeping Watford back from training opportunities, while providing such training to Lyon (Caucasian) who had less seniority than Plaintiff," Resp. at 24 (ECF No. 25-1);

(b) "by initiating multiple union contacts . . . against Plaintiff," <u>id.</u>;

(c) "by initiating an age harassment internal complaint against Plaintiff and finding Plaintiff in violation of its anti-harassment policies based on bogus allegations by his General Supervisor," <u>id.</u> at 24-25; and

(d) by "Widhson only suspend[ing] Plaintiff without pay . . . and not Lyon, during the pendency of the investigation," even "though both men were alleged to have made derogatory statements." <u>Id.</u> at 25.

First, regarding Watford's allegation that he was not able to ride along with other drivers while waiting to earn his Class-B license, as stated above, Watford testified that he did not believe this was due to race. Moreover, Rohrer explained that due to a contract dispute which delayed the ability of Watford and Lyon to earn their Class B licenses, there was less work that they could perform. Other than Watford's bald

20

allegation, there is no evidence that Lyon was allowed more
ride-alongs than Watford, which calls into question whether any
reasonable jury could link the allegation to discriminatory
animus. Moreover, given that this situation was temporary and
did not affect Watford's over-all conditions of employment, no
reasonable jury could find it severe or pervasive.

Second, regarding Widhson's initiation of the union
contacts due to Watford's hesitancy in complying with the hazmat
endorsement requirement, this is a facially neutral requirement
with which Watford's African American and Caucasian co-workers
also had to and did comply. There is no evidence that Widhson's
initiation of union contacts in regards to the testing were
related to racial discrimination rather than forcing Watford to
comply with the requirement within a timeframe Widhson found
acceptable. Thus, no reasonable jury could link the initiation
of union contacts (due to Watford's failure to comply with a
requirement of his position) with racial discrimination.

Third, regarding Widhson's discrimination complaint
against Watford, Watford admitted to making the ageist comments.
There is no evidence or even reasonable inference that Widhson
filed the complaint in response to Watford's race. Instead, the
only evidence indicates that Widhson filed the complaint to
address behavior he saw as disrespectful. Thus, no reasonable
jury could link Widhson's complaint to racial discrimination.

Fourth, regarding Watford's receipt of the 30-day paid suspension and the fact that Lyon was not disciplined, as explained above, there is no evidence that Watford filed a complaint against Lyon that could have resulted in Lyon's temporary suspension. Given the accusation that Watford used a slur against Lyon, no reasonable jury could link the paid suspension and investigation to discriminatory animus on the part of PGW.

Finally, most of Watford's stated instances of an alleged hostile work environment do not pass the first requirement, that there be evidence the alleged harassment is linked to discriminatory animus. Considering those circumstances in the aggregate that a jury could conceivably link to discriminatory animus (specifically that Watford was not allowed to engage in ride-alongs as often as his Caucasian co-driver Lyon), as mentioned above, the court concludes that no reasonable jury could find them severe or pervasive given the temporary nature of the issue and the lack of evidence that it affected Watford's pay or ability to engage in the duties of a Senior Driver II. See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) ("To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance.'")
(quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).

      As a result, summary judgment on Watford's claim of
hostile work environment is warranted.

**D.   Failure to Accommodate Disability (Count V)**

      Watford alleges that PGW failed to adequately
accommodate his disability because PGW did not designate
accessible spaces until a year after he first inquired about
such spaces. Watford's ADA and PHRA claims may be analyzed under
the same standard. <u>Macfarlan v. Ivy Hill SNF, LLC</u>, 675 F.3d 266,
274 (3d Cir. 2012).

      An employer must make "reasonable accommodations to
the known physical or mental limitations of the [employee]
unless the [employer] can demonstrate that the accommodation
would impose an undue hardship on the operation of the business
of the [employer]." <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495,
504-05 (3d Cir. 2010) (quoting <u>Williams v. Philadelphia Hous.</u>
<u>Auth. Police Dep't</u>, 380 F.3d 751, 761 (3d Cir. 2004) (abrogated
by statute on other grounds as stated in <u>Robinson v. First State</u>
<u>Cmty. Action Agency</u>, 920 F.3d 182, 188 n.30 (3d Cir. 2019)). "A
plaintiff bringing an ADA failure-to-accommodate claim must
establish: '(1) he was disabled and his employer knew it; (2) he
requested an accommodation or assistance; (3) his employer did

not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'" Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017) (quoting Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006).

While PGW knew of Watford's two knee surgeries and his inquiry into the existence of accessible spaces, it also knew that he had been cleared for full-duty work by his physician. Temporary impairments are not protected under the ADA and PHRA. Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002). Once Watford produced proof that he was authorized to park in accessible spaces, PGW moved quickly to create appropriate parking less than two months later. No reasonable jury could conclude that PGW acted unreasonably or in bad faith when it created accessible spaces within two months of receiving such evidence. Therefore, summary judgment is appropriate on this claim.

**IV.  CONCLUSION**

For the reasons set forth above, the Court will grant PGW's motion for summary judgment, and enter judgment in its favor.

An appropriate order follows.